UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

American Civil Liberties Union of
Minnesota,

                 Plaintiff,

      vs.

Tarek ibn Ziyad Academy; Islamic
Relief USA; Brenda Cassellius, in
her capacity as Minnesota
Commissioner of Education; and
Asad Zaman; Asif Rahman;
Mahrous Kandil; Mona
Elnahrawy; Moira Fahey; and
Mohamed Farid, individually and
in their capacities as Directors of
Tarek ibn Ziyad Academy,

             Defendants.

Civil File No. 09–CV–138 DWF/JJG

**DEFENDANT COMMISSIONER OF EDUCATION'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S CLAIM AND ON CROSS-CLAIM FOR INDEMNIFICATION AGAINST TAREK IBN ZIYAD ACADEMY**

## INTRODUCTION

Defendant Brenda Cassellius, Commissioner of the Minnesota Department of Education ("Commissioner"), respectfully moves this Court for:

(1)     Summary judgment and dismissal of Plaintiff's claim with prejudice; and

(2)     Summary judgment on the Commissioner's cross-claim for indemnification against Defendant Tarek ibn Ziyad Academy ("TiZA"), with payment to be determined as appropriate.

There are no genuine disputes of material fact as to these two matters. Summary judgment for the Commissioner is appropriate.

Because there are no genuine disputes as to the appropriateness of the Department's response to known complaints about TiZA, the Court should grant the Commissioner's motion for summary judgment against Plaintiff ACLU.   When the Commissioner was made aware of sectarian (or any other) complaints against TiZA, there is no genuine dispute that she investigated and resolved those issues.   As has become clear only in discovery in this litigation, there were significant other facts and practices about which the Commissioner did not know and/or that TiZA misrepresented to the Commissioner.   Whether or not TiZA's alleged practices promoted religion, the Commissioner cannot be held constitutionally responsible for third-party violations about which she had no knowledge.   Plaintiff thus cannot make out the elements of its Establishment Clause claim against the Commissioner, and summary judgment is appropriate.

Summary judgment for the Commissioner on her cross-claim for indemnification against TiZA also is appropriate.   There is no genuine dispute that the applicable contracts and statute contemplate TiZA's indemnification of the Commissioner for any suits, claims, or liability, including attorney's fees, arising out of the nonsectarian requirements in the authorizer contract.   While the amount of any such indemnification cannot be finalized until litigation costs are final, there can be no debate that the Commissioner is entitled to reimbursement for all costs incurred by her and ultimately imposed upon her for TiZA's actions.

### UNDISPUTED MATERIAL FACTS

The following material facts are not in dispute.

A.     **PLAINTIFF'S ESTABLISHMENT CLAUSE CLAIM**

On January 21, 2009, Plaintiff filed its initial Complaint against the Commissioner

and other defendants, including TiZA and TiZA's authorizer, Islamic Relief USA,

alleging that the defendants collectively violated the state and federal establishment

clauses for failing to ensure that TiZA operated in a nonsectarian manner.  Plaintiff's

claims against the state subsequently were narrowed, some voluntarily and some in

response to the Commissioner's Motion to Dismiss.  In the meantime, on July 30, 2009,

the Commissioner notified TiZA that, in light of the lawsuit, she intended to preserve all

of her rights to indemnification under the charter school contracts.  Att. A to Affidavit of

Kathryn Woodruff ("Woodruff Aff.").[1]  TiZA's counsel acknowledged receipt of the

Commissioner's July 30, 2009 letter.  *Id.*

1.     **Complaint**

Plaintiff filed its First Amended Complaint on August 4, 2009 (Doc. No. 66).

Only five paragraphs of the 74-paragraph Complaint allege violations by the

Commissioner, who is named only in her official capacity.  Plaintiff alleges that she

violated the U.S. Constitution's Establishment Clause by:

- failing to "terminate[ ] Islamic Relief's sponsorship of TiZA" and "allowing funds to be disbursed" to TiZA "despite TiZA's repeated violations of law," First Amended Complaint at ¶ 58;

- "approv[ing] statutory distribution of funds to TiZA despite the school's constitutional violations," *id.* at ¶ 8;

---

[1] Except as otherwise noted, all deposition transcripts and record documents are attached to the Affidavit of Kathryn Woodruff ("Woodruff Aff.").

- "appl[ying] . . . the Minnesota Charter School Act to provide for public funding and operation of TiZA," *id.* at 66 (alleged against all Defendants; and

- "allow[ing] funds to be distributed to TiZA despite its unconstitutional promotion, endorsement, and establishment of religion," *id.* at 68 (alleged against the Commissioner and Islamic Relief).

Plaintiff also states that "available records" do not indicate that "the Department and TiZA followed approval requirements of [the charter school law]" with respect to TiZA's annual application for lease aid, nor has the Department "generated documentation establishing that TiZA's lease rates are reasonable." *Id.* at ¶ 56(d).

For its remedy against the Commissioner, Plaintiff seeks a declaratory judgment "that the public funding of TiZA violates the [federal] Establishment Clause,"[2] "preliminary and permanent injunctive relief requiring [the Commissioner and other] Defendants to correct and eliminate establishments of religions by TiZA[,]" and attorneys' fees and costs. First Amended Complaint at 21.

## 2. Commissioner's Oversight of Charter Schools

Minnesota law provides for the creation and operation of charter schools, which are public schools authorized and operated under the supervision of a sponsor (now known as an authorizer). Affidavit of Karen Klinzing at ¶ 3 ("Klinzing Aff."), Att. 1 (Minn. Stat. § 124D.10). Authorizers may be certain private or public entities, including nonprofit entities that meet certain specified criteria. *See id.* at subd. 3. Authorizers must be approved by the Commissioner. If approved, an authorizer and a charter school enter

---

[2] The Complaint also seeks a declaratory judgment that the public funding of TiZA violates the state constitution's establish clause provisions, but the Eleventh Amendment bars a federal court from issuing such a state law judgment against the Commissioner.

into a written contract governing the charter school's operation.   Charter schools must comply with all applicable laws and must, among other things, operate in a nonsectarian manner.  *See id.* at subd. 8.

Day-to-day operations of a charter school are overseen by the charter school administration and Board, with assistance as needed from the school's authorizer.  With the exception of statutorily-required audits and reviews, the Commissioner's oversight of charter schools is largely complaint-driven.  Klinzing Aff. at ¶ 3; Att. B to Woodruff Aff. at 71:20-74:14 & 75:14-76:1; Att. C to Woodruff Aff. at 369:23-370:4 & 397:22-398:14. When the Commissioner receives a complaint about a charter school, Department staff may conduct an independent investigation as appropriate.  Corrective action is imposed where necessary. *See id.*   The Commissioner also may forward such complaints to the authorizer for appropriate action.  *See id.*

### 3.    Commissioner's Approval of Islamic Relief and TiZA

Islamic Relief USA applied to become a sponsor and to charter TiZA in 2002. Att. D to Woodruff Aff.  Islamic Relief USA has been based in California for the time period applicable to this lawsuit.  The Commissioner initially rejected the application because of concerns that an out-of-state entity may have difficulty properly overseeing a Minnesota charter school.   *See* Att. E to Woodruff Aff.   Islamic Relief remedied this concern by representing to the Department that it had hired a Minnesota-based agent (Wayne Jennings) who would serve as liaison to Islamic Relief in California, and the Department ultimately approved the application.  *See* Att. F to Woodruff Aff.   In the application, as part of the standard application process for all charter schools, TiZA and

Islamic Relief were required to assure the Department that TiZA would operate in a nonsectarian manner. *See* Att. D to Woodruff Aff. at Bates-numbered pages IRUSA-001226, 001233 & 001251. TiZA opened its Inver Grove Heights site in fall 2003 and its Blaine site in fall 2007. *See* Klinzing Aff. at ¶ 4.

### 4. Commissioner's Investigation of Known Sectarian Complaints Against TiZA

In 2004 and 2008, the Department investigated complaints about potential sectarian practices at TiZA. Klinzing Aff. at ¶ 5. In 2004, in connection with an on-site investigation into several nonsectarian complaints about TiZA, Department staff raised concerns about several apparently sectarian issues they had observed at the school, namely religious material posted on school property and the apparent use of a prayer rug. The Department communicated these concerns to TiZA. *See id.*; Att. G to Woodruff Aff.; Att. B to Woodruff Aff. at 87:6-88:7 & 89:6-92:24. In response, TiZA represented that the referenced religious material had been taken down and that TiZA "operates a non sectarian public school program." TiZA acknowledged that a carpeted area in the school's lower level was used for "Student-Led Prayers," but stated that it also was used for other educational activities, and affirmed that "no area of the school is covered by a prayer rug." Att. H to Woodruff Aff. At that time, the Department considered TiZA's response to be satisfactory. Att. B to Woodruff Aff. at 93:25-94:10; 97:20-25; 98:8-14 & 99:16-100:9.

The Department corresponded with TiZA later that year after a *Pioneer Press* newspaper article reiterated concerns about a prayer rug and questioned the school's food

service practices during Ramadan.[3]  Att. I to Woodruff Aff.; Att. B to Woodruff Aff. at

104:11-105:10 & 111:15-20.   Again, at that time, TiZA responded to the Department's

satisfaction, reiterating that the carpeted area in the school was an "assembly area" used

for numerous activities, including student prayer, and confirming that TiZA's students

were provided with lunch options during Ramadan.  Att. J to Woodruff Aff.; Att. B to

Woodruff Aff. at 105:17-108:25 & 109:25-110:3.   TiZA also represented to the

Department that "[a]ll religious expression in the school is student led and initiated."  Att.

J to Woodruff Aff.

In early 2008, *Star Tribune* columnist Katherine Kersten wrote several articles

critical of TiZA, alleging potentially sectarian practices at the school that allegedly were

witnessed by a substitute teacher at the school.   The Department viewed these articles as

complaints and investigated the allegations, which implicated after-school activities and

transportation and student prayer.  Att. K to Woodruff Aff.; Att. L to Woodruff Aff.; Att.

B to Woodruff Aff. at 113:1-115:10; 116:20-119:20; 143:23-147:1; 156:11-160:20 &

165:14-180:21.   The Department conducted two site visits over the course of 2008 to

observe and verify practices at the school.  *Id.*

TiZA represented to the Department during the investigation that "TiZA is careful

to neither favor any particular religion or non-religion," that its buses did not leave until

---

[3] There was an additional nonsectarian concern raised about TiZA's admissions policy at
that time.  TiZA represented to the Department that it "complies with all applicable laws
and regulations with regard to admission," including by holding a lottery if there are
more applicants than open spots.  Att. J to Woodruff Aff.  At that time, there was no
reason to suspect that TiZA could not produce evidence of its admission lotteries; that
information has since come out for the first time in this litigation.

after after-school programs ended at 4:30 p.m. so that TiZA could "realize[ ] significant cost savings by purchasing bus services during off-peak hours[,]" and that its after-school programs were voluntary and occurred after the school day was officially over.  Atts. M & O to Woodruff Aff.   After investigation, the Department determined that TiZA's Friday prayer practices and transportation policy needed modification in order to be compliant with nonsectarian requirements.  Specifically, the Department directed TiZA to shorten its Friday prayer and cease its practice of involving adults in Friday prayers; TiZA also was to provide reimbursement to any parent who wished to transport his or her child home at 3:30 p.m. when classes ended rather than waiting until 4:15 or 4:30 p.m. when the buses arrived.  Att. N to Woodruff Aff.; Att. B to Woodruff Aff. at 165:14-180:21.[4]  The Department conducted a follow-up unannounced visit to verify the school's

---

[4] At that time, based on its own observations and TiZA's representations regarding the voluntary nature of its after-school programs (including the Islamic Studies program run by MAS-MN), the Department did not deem it necessary to further investigate TiZA's relationship with the entities providing after-school offerings.  TiZA, in fact, represented to the Department that "We have no administrative relationship with . . . the Muslim American Society of Minnesota . . . [.]  They are co-located in our building in an entirely separate space.  Their own activities, including anything that might involve religion or cultural activities, are conducted with no input from any person on behalf of the Academy."  TiZA further represented to the Department that, with respect to any after-school programs, which commenced after 3:30 p.m., "[t]he use of the building after hours by [MAS-MN and others] does not require permission or any involvement whatsoever from TiZA."  Att. M to Woodruff Aff.

The Department learned for the first time in this litigation, however, that this statement misrepresented TiZA's relationship with MAS-MN.  Apart from learning about extensively intermingled resources between TiZA and MAS-MN, the Commissioner learned for the first time in discovery that MAS-MN paid TiZA teachers to teach Islamic Studies during TiZA teacher contract time.  Teacher contract time, the Department learned in discovery, did not end at 3:30 p.m. with the end of classes, contrary to TiZA's 2008 representation that the use of the building after-hours did not require "any

changes to Friday prayer practices; at that time, based on the Department's observations and TiZA's representations, the Department concluded the matter was resolved.[5]  Att. O to Woodruff Aff.; Att. P to Woodruff Aff.; Att. B to Woodruff Aff. at 185:6-189:18 & 190:2-194:15.  *See* Klinzing Affidavit at ¶ 6..

A separate complaint later that year by a former substitute teacher alleged that TiZA used a religious video in an Arabic-language class.  The Department confronted TiZA with the issue.  Att. Q to Woodruff Aff.  TiZA acknowledged that the incident had occurred, indicated that the DVD was used "without administration consent," and stated that the employee "was properly disciplined."  Att. R to Woodruff Aff.  TiZA also represented that it would "undertake to begin an extensive review of ALL our curricula to ensure that no impermissible religious content is taught at TiZA."  *Id.*  Based on these representations, the Department considered the matter satisfactorily resolved.[6]  Att. C to Woodruff Aff. at 422:11-18.

Apart from the complaints in 2004 and 2008, the Department has not received any other complaints about sectarian practices at TiZA, with the exception of those raised for

---

involvement whatsoever from TiZA."  Rather, teachers were required by contract to stay until 4:30 p.m., after the after-school program ended and when the buses departed.  *See, e.g.,* Att. S to Woodruff Aff. at 171:21-175:20.  *See* Klinzing Affidavit at ¶ 10.

[5] The Department also reviewed the school's English-language curriculum and did not find any areas of sectarian concern.  Att. B to Woodruff Aff. at 179:7-24.  The Department did not review the school's Arabic curriculum.

[6] This was before the Department learned that TiZA's Arabic curriculum contained impermissible content.  The Department learned this fact only in discovery in this litigation.  Klinzing Aff. at ¶¶ 7, 10.

the first time in this litigation and/or learned about for the first time in discovery in this litigation (see notes to factual text and below). Klinzing Affidavit at ¶ 13.

### 5.  Commissioner's Approval of TiZA's Lease Aid

The Department maintains a large lease aid spreadsheet containing data on individual charter school leases, including lease rates per square foot. For each year, TiZA's lease rate per square foot is near the median for all Minnesota charter schools. Affidavit of Thomas Melcher ("Melcher Aff.") at ¶ 3.

During the time period implicated in this lawsuit, based on representations provided by TiZA, TiZA met the requirements for receiving lease aid. *See generally* Att. C to Woodruff Aff. at 278-296; Att. T to Woodruff Aff. As part of its annual lease aid application, TiZA represented to the Department that TiZA Board members had no conflicts of interest with TiZA's landlords. *E.g.,* Att. U to Woodruff Aff. The Commissioner was not aware of – and had no reason to be aware of – allegations of potential conflicts of interest between TiZA representatives and its landlords until this litigation commenced. Klinzing Affidavit at ¶ 7.

Prior to 2009, the Department was required by statute to consult with the Department of Administration about any charter school lease with a sectarian organization. The Department consulted with the Department of Administration from time to time, but found that such consultation produced limited feedback that duplicated (not supplemented) Department efforts and delayed aid payments to schools. Melcher Aff. at ¶ 4. At the Department's recommendation, the legislature eliminated the consultation requirement in its 2009 amendments to the charter school law. *Id.*

### 6.    Commissioner's Lack of Prior Knowledge of Remaining Issues

Apart from the known sectarian complaints listed above in 2004 and 2008, the

Commissioner was not aware of any of the remaining sectarian allegations against TiZA

in the First Amended Complaint until this litigation and discovery commenced.  Klinzing

Affidavit at ¶¶ 7-11.  Such previously unknown sectarian allegations include:

- Dual involvement by TiZA Board members and "trustees/members" in the formation, management, operations, and/or lease agreements between TiZA, TiZA's sectarian landlords and their sectarian parent companies, including the Muslim American Society of Minnesota (MAS-MN) and its property holding company (MAS-MN PHC); and the Minnesota Education Trust (MET) and its property holding company (Blaine PHC) (e.g., Plaintiff's First Amended Complaint at ¶¶ 18, 33-38, 40-46) (Doc. No. 66);
- The Muslim clothing rules embodied in TiZA's staff and student dress codes (¶ 50);
- The prohibition of non-halal food on TiZA campuses (¶ 51);
- The organization of TiZA's school calendar around Muslim holidays (¶ 53);
- The manner of addressing teachers and staff using "Brother" and "Sister" (¶ 54).

In addition, in 2010, as part of discovery in this litigation, the Commissioner

learned for the first time that TiZA used an Arabic language curriculum that was

marketed by the bookseller as "offering a very strong focus on Qu'ran, Haddith and

Islamic values."  Att. V to Woodruff Aff.; Klinzing Aff. at ¶¶ 7, 10.  *Cf.* Att. S to

Woodruff Aff. at 248:21-252:20 (acknowledging curriculum).  The Commissioner also

learned for the first time in discovery that, both prior to opening and in its early years,

TiZA was marketed to the Muslim community as an Islamic school.  *E.g.,* Att. W to

Woodruff Aff. at Deposition Exh. 147 (throughout); Dep. Exh. 146 at ACLU0009107;

Dep. Exh. 136 at MAS-MN 427, 429; Klinzing Aff. at ¶ 7.  In August 2010, the parties

11

were informed that the signatures of Islamic Relief's former President, Ahmad el Bendary, were forged on at least seven documents submitted to the Minnesota Department of Education between 2002 and 2005, including the original affidavit of intent to sponsor a charter school, and subsequent applications for site and grade expansion.  Klinzing Aff. at ¶ 8; Att. X to Woodruff Aff. at 64:7-69:9; 80:23-86:4; 90:5-97:5; 106:18-114:25.[7]

7.     **Previously Unknown TiZA Misrepresentations to Department**

Through discovery in this litigation, the Commissioner discovered that TiZA has made multiple misrepresentations to the Department.    The Department and Commissioner were not aware of these misrepresentations prior to this litigation, and the

---

[7] The Commissioner also was previously unaware of many *nonsectarian* issues raised for the first time in Plaintiff's First Amended Complaint (Doc. No. 66), and had received no prior complaints about such issues, including:

- TiZA's test scores (¶ 22);

- Shadow management structures set up by TiZA independent of its Board of Directors, including "trustees" or "members" of the TiZA nonprofit corporation (¶¶ 10-13);

- That TiZA's former staff handbook policy misstated the definition of "confidential data" under the Minnesota Data Practices Acts and imposed illegal restrictions on staff discussion of school business, operations and finances (¶¶ 19).

- Involvement in TiZA's management and related corporate entities by individuals not part of TiZA's Board of Directors, including Asif Rahman (*e.g.*, ¶¶ 10, 44).

None of these issues form the basis for a potential Establishment Clause claim.  Once discovered, however, the Commissioner communicated with TiZA about these matters outside this litigation.  Klinzing Aff. at ¶ 9.

Department relied on those misrepresentations in making decisions about TiZA. Klinzing Aff. at ¶¶ 10, 11.  These misrepresentations include but are not limited to: potential conflicts of interest between TiZA and its sectarian landlords;[8] TiZA's relationship and shared resources with its sectarian co-tenant;[9] the true end to TiZA's school day;[10] and the sectarian nature of the Arabic curriculum.[11]  Such representations formed the basis for, among other things, the Department's consideration of TiZA's annual lease aid applications and investigative determination of whether TiZA was in compliance with nonsectarian requirements.  Klinzing Aff. at ¶ 10.

In addition, documents containing forged signatures (discussed above) formed the basis for the Department granting Islamic Relief's request to sponsor TiZA, for TiZA to become a charter school, as well as for granting TiZA's requested site and grade expansions.  Klinzing Aff. at ¶ 11.

---

[8] *Compare, e.g.,* Att. U to Woodruff Aff. (TiZA's representation that there are no conflicts of interest with its landlords) *with* Att. BB to Woodruff Aff. (evidence that TiZA Board Member Zaman and TiZA disbursement authorizer Rahman served in positions of authority with MAS-MN PHC and MAS-MN).

[9] *Compare, e.g.,* text of n.4, supra (TiZA's representation regarding administrative separation of MAS-MN and TiZA), *with* Att. AA to Woodruff Aff. (evidence of ongoing shared resources with MAS-MN).

[10] *Compare, e.g.,* n.4, *supra*, Att. M to Woodruff Aff. (representing that use of building for after-school programs does not require "any involvement whatsoever by TiZA") *with* Att. S to Woodruff Aff. & n.4, *supra* (requirement that staff work through the after-school program until the buses depart at or around 4:30 p.m.)

[11] *Compare, e.g.,* Att. D to Woodruff Aff. (representing that TiZA will be nonsectarian in its operations) *with* Att. V to Woodruff Aff. & p. 11, *supra* (evidence of sectarian Arabic curriculum).

## B.   COMMISSIONER'S INDEMNIFICATION CROSS-CLAIM

Because the terms of the underlying authorizer contracts are fixed, the undisputed facts are essentially the same as what the Commissioner set forth in her Memorandum in Opposition to TiZA's Motion for Judgment on the Pleadings (Doc. No. 231, filed March 5, 2010).  The only open issue is a final dollar amount, but that cannot be known until all costs are final.

Briefly, as required by state charter school law, TiZA has entered into a series of sponsorship contracts with co-Defendant Islamic Relief USA ("Islamic Relief").  *See* Minn. Stat. § 124D.10, subd. 6 (2009) (requiring written contract between sponsor and charter school); Doc. No. 96 at Exh. A (2003 Contract) and B (2006 Contract).[12]  The contracts govern the relationship and expectations of the parties with respect to TiZA's school operations.   Among other things, the contracts require TiZA to comply with applicable laws, statutes, and regulations, including that the school be "nonsectarian in its programs, admission policies, employment practices and all other purposes."  *See*  Doc. No. 96 at Exh. A at ¶ 1.2 (2003 Contract); Exh. B. at ¶ 1.2 (2006 Contract).  In addition, under the contracts in effect during the timeframe implicated in this lawsuit, TiZA "shall assume full liability for its activities *and* shall indemnify and hold harmless the Commissioner and the Sponsor [Defendant Islamic Relief USA], its officers, and their agents and employees from any suits, claims, or liability arising under this Contract."

---

[12] There also is a contract executed in May 2009 that became effective on July 1, 2009, *see* Doc. No. 230-1.  Because this action was commenced in January 2009, any actions attributed to the Commissioner would precede January 2009 and fall under one or both of the 2003 and 2006 contracts.

*See id.*, Exhs. A & B at § 5.4 (emphasis added).  Subsequent discovery in this litigation revealed that, when TiZA renewed its contract with Islamic Relief in 2009, TiZA unilaterally eliminated indemnification of the Commissioner without notice to or approval from her.

Plaintiff's lawsuit against the Commissioner alleges that the Commissioner should not have allowed funds to flow to TiZA because TiZA has not operated its school in a nonsectarian manner.

On July 30, 2009, in light of this litigation, the Commissioner notified TiZA that she was preserving all rights to indemnification under section 5.4 of the charter school contracts.  Att. A to Woodruff Aff.  TiZA acknowledged receipt of the Commissioner's correspondence that same day.  *Id.*

On September 4, 2009, the Commissioner amended her Answer to the Plaintiff's First Amended Complaint and asserted a Cross-Claim against TiZA for indemnification under the contracts.  (Doc. No. 96).  On September 14, 2009, TiZA replied to the Cross-Claim, denying all liability and denying that the Commissioner was entitled to indemnification.  (Doc. No. 97).  On February 12, 2010, TiZA moved for judgment on the pleadings as to the Commissioner's cross-claim. (Doc. Nos. 209, 222, 223), to which the Commissioner replied on March 5, 2010 (Doc. No. 231).

In denying TiZA's Motion for Judgment on the Pleadings, this Court recognized the indemnification provision in the charter school contracts and found that "Plaintiff's allegations [against the Commissioner] are covered under the indemnification clause." May 7, 2010 Order at 12-13 (Doc. No. 260).  The Court also found that TiZA "failed to

demonstrate that the indemnification clauses in the Contract are contrary to public policy and are unenforceable under Minnesota law." *Id.* at 14 n.6.[13]

## ARGUMENT

**I.   THERE ARE NO GENUINE DISPUTES OF MATERIAL FACT ON PLAINTIFF'S ESTABLISHMENT CLAUSE CLAIM AGAINST THE COMMISSIONER AND SUCH CLAIM MUST BE DISMISSED AS A MATTER OF LAW.**

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c) (2010).  In considering a motion for summary judgment, courts may rely on "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions, interrogatory answers, or other materials." *Id.* *Cf. Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  Only disputes over facts that might affect the outcome of the case under governing law will properly preclude summary judgment.  *E.g., Liberty Lobby*, 477 U.S. at 248.  A party opposing a properly supported motion for summary judgment "may not rest upon mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine [dispute] for trial." *Id.* at 256.

Courts currently are required to review government actions challenged under the Establishment Clause using the three part test set forth in *Lemon v. Kurtzman*, 403 U.S. 602 (1971).  Under the *Lemon* test, government action is permissible under the Establishment Clause if the action:  (1) reflects a clearly secular purpose; (2) has a

---

[13] Defendant Islamic Relief also has pursued an indemnification against TiZA, with a similar outcome to date.  *See* May 7, 2010 Order at 13-14 (Doc. No. 260).

primary effect that neither advances nor inhibits religion; and (3) avoids excessive entanglement with religion.  *Id.* at 612-13.

The first prong of the *Lemon* test "asks whether government's actual purpose is to endorse or disapprove of religion."  *Edwards v. Aguillard*, 482 U.S. 578, 585 (1987) (citations omitted).  The second and third prongs essentially focus on endorsement of religion.  A practice "endorses" religion if it conveys a message that religion or a particular religious belief is favored or preferred.  *Allegheny County v. ACLU*, 492 U.S. 573, 593 (1989).  As discussed further below, however, a defendant must at least have knowledge of an alleged constitutional violation involving religion, however, in order to be held responsible for endorsing religion.

Plaintiff alleges a single claim against the Commissioner, under the federal Establishment Clause.  Summary judgment is appropriate as to Plaintiff's single claim because there is no genuine dispute as to the three elements of the *Lemon* test.  Plaintiff has adduced no evidence that the Commissioner or any Department staff intended to endorse religion by funding and oversight of TiZA (prong 1).  Plaintiff also has adduced no evidence that religion was "favored" by the Commissioner with respect to TiZA (prongs 2 and 3).  Far from it:  it is uncontested that, during the period covered by the Complaint, the Commissioner appropriately responded to all the sectarian complaints about TiZA about which she was made aware.  As to the potential existence of other constitutional violations committed by TiZA, the Commissioner had no knowledge of such actions (and Plaintiff has not adduced any evidence indicating she did), and the

Commissioner cannot be held liable under the First Amendment for failing to address unknown third-party violations.

### A. There Is No Genuine Dispute About The Appropriateness Of The Commissioner's Response To Known Sectarian Complaints About TiZA.

There is no genuine dispute about the appropriateness of the Commissioner's response to known sectarian complaints about TiZA.

### 1. Sectarian Complaints

Since TiZA opened in fall 2003, there is no genuine dispute that the Commissioner investigated and resolved all sectarian complaints about which she was aware. The Commissioner received such complaints in 2004 and 2008, as detailed in the Facts section, above. Plaintiff finds no fault with the Commissioner's investigation of these incidents. Att. Y to Woodruff Aff. at 13-14; 30-31 (30(b)(6) questioning by Commissioner). Instead, Plaintiff alleges that the Commissioner should have been more curious about the school's operation in light of those complaints and therefore should have conducted a more thorough analysis of TiZA's operations. *Id.* at 38, 40 & 45. Plaintiff even concedes that, at the time, the Commissioner had no reason to disbelieve TiZA's representations about how the school resolved the sectarian complaints and did not know about any entanglements between TiZA and MAS-MN. *Id.* at 13, 15. Failing to be more curious does not amount to an Establishment Clause violation. Plaintiff provides no evidence that the Commissioner knew about, and failed to act on, any alleged sectarian complaint about TiZA during the time period governed by the Complaint. The

Commissioner was just as surprised as Plaintiff when the extent of TiZA's actions was revealed in discovery.[14]

### 2.    Lease Aid

Similarly, Plaintiff has failed to create a genuine dispute as to whether any alleged failure by the Commissioner to follow state statutory lease aid requirements violated the Establishment Clause.[15]   The First Amended Complaint does not specify which statutory requirements were not followed, although there is a general reference to the reasonableness of TiZA's lease rate and to the pre-2009 requirement that the Department consult with the Department of Administration for leases involving sectarian organizations.   Plaintiff's argument against the Commissioner appears to be that the Department should not have awarded TiZA lease aid to rent from this particular sectarian organization, with whom TiZA apparently had administrative ties, because TiZA's lease rate could have been lower.

---

[14] At the time the Commissioner was considering Islamic Relief's application to charter TiZA, moreover, there was no known sectarian reason to deny school approval.  While it subsequently has come out in discovery that key application documents contained forged signatures and that TiZA supporters were marketing the school as Islamic, *see* Facts section, above, the Commissioner had no knowledge of these facts prior to discovery in this litigation in 2010, *e.g.,* Klinzing Aff. at ¶ 7, and Plaintiff does not allege that the Commissioner knew such facts.  Att. Y to Woodruff Aff. at 37.

[15] This claim against the Commissioner, to the extent Plaintiff continues to make it against her, steps very close to, if not over the line on, the Eleventh Amendment bar to federal court jurisdiction over a state official's enforcement of state law.  Plaintiff essentially claims that the Commissioner failed to follow state law in awarding TiZA lease aid.  Any court-ordered remedy for such a claim would be fundamentally entwined with an order to comply with state law.  Respectfully, this is outside the jurisdiction of the federal court.

As an initial matter, the Commissioner had no knowledge of any administrative ties between TiZA and its landlords. Klinzing Aff. at ¶ 7. In fact, TiZA's annual lease aid applications represented to the Department that there were no conflicts of interest, *see* Att. U to Woodruff Aff., and at the time there was no reason to doubt those representations. In addition, the uncontroverted evidence indicates that TiZA's lease rate per square foot – the applicable yardstick – was close to the median for all charter schools. *See* Melcher Aff. at ¶ 3. Plaintiff suggests that the Commissioner should have gone beyond the lease agreement and obtained and analyzed TiZA's building records to determine whether the school's lease arrangements were reasonable. There is no requirement, statutory or otherwise, that the Commissioner obtain and analyze building records for charter schools (of which there are approximately 150, some with multiple sites) to determine whether proposed lease rates *could have been* less, particularly where the proposed lease rate falls within the range for all other schools. TiZA's representations on its lease applications satisfied the applicable criteria, *see generally* Att. C to Woodruff Aff. at 278-296, and there is no indication that granting TiZA's lease aid based on its proposed rate amounted to an unconstitutional promotion of religion by the Commissioner.[16]

---

[16] The Commissioner acknowledges that the Department did not regularly consult with the Department of Administration regarding sectarian leases, as required by the pre-2009 charter school law. There is no evidence, however, much less disputed evidence, that such lapse caused the Commissioner to unconstitutionally promote religion, in TiZA or any other school. As it happened, consultation with the Department of Administration produced duplicative (not supplemental) feedback on leases and delayed aid to schools. Melcher Aff. at ¶ 4. Recognizing this, legislature deleted such requirement in 2009.

### 3.    Remaining Alleged Violations

All other putative constitutional violations committed by TiZA were not known to the Commissioner prior to this litigation, as noted in the Facts section, above.  Plaintiff has not adduced any facts suggesting that the Commissioner knew or should have known of these matters.  In fact, the absence of new complaints, TiZA's repeated assurances that it was operating in accordance with applicable law, and its annual lease aid assurances that there were no conflicts of interest, provided reasonable grounds for the Commissioner to believe that there was no new cause for investigation.

Plaintiff has stated that when it conducted its own investigation of possible sectarian ties to TiZA, it was able to obtain third party documents that allegedly were in the public domain.  These, however, generally are not the type of documents that the Commissioner or the Department would come upon in the normal course of business, in the absence of a specific complaint.  Plaintiff's own investigative materials include, for example, historic records involving the sale of school property, federal tax forms and articles of incorporation for TiZA's landlords, Twin Cities Muslim and MAS-MN Yahoo group emails, and marketing materials for MAS-MN conventions.  Plaintiff has not pointed to any statutory requirement -- nor would it be reasonable to expect -- that the Department be responsible for reviewing third-party documents of this kind in connection with the complaints it received about TiZA.  None of the complaints received by the Department have prompted the kind of extensive and wide-ranging search conducted by Plaintiff's investigator.  It is undisputed that the Department conducted numerous site visits to personally verify concerns about TiZA, and Plaintiff itself conceded that such

investigations were adequate.  To the extent Plaintiff's Establishment Clause claim against the Commissioner is based on an alleged failure to properly investigate known concerns, summary judgment must be granted for the Commissioner, because Plaintiff itself concedes that the Commissioner adequately investigated and resolved known sectarian complaints about TiZA.

### B.   The Commissioner Cannot Be Held Responsible For Constitutional Violations By The TiZA Defendants Of Which She Was Not Aware.

It already is established that the Commissioner adequately responded to known sectarian complaints about TiZA.  To the extent Plaintiff bases its claim against the Commissioner on her failure to investigate claims about which she had *no* knowledge, such claim also must fail as a matter of law.  The Commissioner cannot be held liable under the First Amendment for failing to address a third-party's violations that were unknown to her.

With the exception of the incidents discussed above, to the extent Establishment Clause violations occurred at TiZA, they were not known to the Commissioner prior to this litigation.  Indeed, such actions would have violated the Commissioner's policies and clear state law requiring charter schools to operate in a nonsectarian manner. Responsibility for any such action thus would lie with the school and not the Commissioner.  *See, e.g., Doe v. Wilson County Sch. System*, 564 F. Supp.2d 766, 804 (M.D. Tenn. 2008) (ordering injunctive relief against school principal and director, but not School Board, where principal did not follow Board policy, principal's own policies and practices were what caused violation of complainants' constitutional rights, and

Board had no notice of principal's actions that had effect of promoting religion in school). *Cf. Thelma D. v. Bd. of Educ. of City of St. Louis*, 934 F.2d 929 (8th Cir. 1991) (school board not liable for teacher's violation of student's constitutional rights where board had no knowledge of teacher's conduct).

Because the Commissioner cannot be held responsible for third-party violations about which she had no knowledge, summary judgment for the Commissioner on Plaintiff's Establishment Clause claim is appropriate.[17]

## II.   THERE ARE NO GENUINE DISPUTES OF MATERIAL FACT ON THE COMMISSIONER'S INDEMNIFICATION CROSS-CLAIM AGAINST TIZA AND THE COMMISSIONER IS ENTITLED TO JUDGMENT AS A MATTER OF LAW.

There also are no genuine disputes about the Commissioner's entitlement to indemnification from TiZA in this litigation. The only question remaining at this point is the dollar amount, which cannot be known until litigation costs are final. This, however, does not defeat the Commissioner's entitlement to indemnification as a matter of law.

Summary judgment is an appropriate method of resolving disputes concerning indemnification agreements. *E.g., Spirtas Co. v. Ins. Co. of State of PA*, 555 F.3d 647, 655 (8th Cir. 2009). Indemnification clauses such as the one at issue here are enforceable if the clause: "(1) is not ambiguous; (2) does not release intentional, willful, and wanton acts; and (3) does not violate public policy." *Myers v. Lutsen Mts. Corp.*, 587 F.3d 891,

---

[17] Despite only learning of these potential issues for the first time in this litigation, once revealed, the Department communicated with TiZA about them. *E.g.,* Klinzing Aff. at ¶ 9. Where such issues have not been independently resolved, the Department is holding independent resolution in abeyance pending the outcome of this litigation.

894 (8th Cir. 2009).   The challenged indemnification provision here meets all of these requirements.

### A.   Applicable Contracts Require TiZA to Indemnify The Commissioner For Claims Arising Under The Contract.

As noted above in the Undisputed Facts, the charter school contracts applicable to this action unambiguously require TiZA to indemnify the Commissioner and the Sponsor (here, Islamic Relief USA) for any suits, claims or liability arising under those contracts. The contracts also require TiZA, among other things, to operate in a nonsectarian manner.  *See* p. 5, above; Doc. No. 230-1 (¶ 1.2 in all contracts).   This Court already has concluded that the "plain language" of such contracts "entitle[s] [the Commissioner] to pursue her indemnification claim." and that, because Plaintiff's suit alleges TiZA violated applicable law by operating in a sectarian manner, "Plaintiff's allegations are covered under the indemnification clause."  May 7, 2010 Order at 13.[18]

### B.   Indemnification Of The Commissioner Is Consistent With The Charter School Legislative Scheme And Good Public Policy.

Indemnification of the Commissioner for any liability imposed against her for violations perpetrated by TiZA is consistent with Minnesota's statutory charter school

---

[18] Indemnification for the Commissioner apparently was deleted from the 2009 Contract, which became effective July 1, 2009.   That contract change was done without the Commissioner's knowledge or approval, however, Klinzing Aff. at ¶ 14, and is inconsistent with the statutory scheme designed by the Minnesota legislature, which provides civil and criminal immunity to the Commissioner (and the authorizer) for "all activities related to a charter school[.]"  Minn. Stat. § 124D.10, subd. 25(c) (2009).   As one who approves charter schools, the Commissioner also is a reasonable third-party beneficiary of the resulting operational contract, particularly to the extent a third party attempts to hold the Commissioner liable for actions that are not her own.

structure and good public policy.  Under the charter school law, the Commissioner and a putative authorizer take the risk of approving a charter school, but are not and should not be held responsibility for any subsequent liability solely attributable to the school.  *See generally* Minn. Stat. § 124D.10, subd. 25(c) (2009) (providing civil and criminal immunity to the Commissioner and the school's authorizer "with respect to all activities related to a charter school they approve or authorize.")[19]  Similar language existed in the previous charter school law (substituting the word "sponsor" for "authorizer").  This provides appropriate protection for the Commissioner, who, in the absence of known complaints, must be permitted to rely on oversight by the school's board and its authorizer, and should not be held liable for unknown actions by these entities.[20]

In its May 7, 2010 Order denying TiZA's Motion for Judgment on the Pleadings, moreover, the Court found that TiZA "failed to demonstrate that the indemnification clauses in the Contract are contrary to public policy and are unenforceable under Minnesota law."  May 7, 2010 Order at 14 n.6 (Doc. No. 260).[21]

---

[19]  Moreover, this indemnification clause is a standard provision in nearly every Minnesota charter school contract.  Klinzing Aff. at ¶ 15.

[20]  It is undisputed that TiZA had the benefit of legal counsel throughout its existence, including when entering into these authorizer contracts.  Att. Z to Woodruff Aff. at 840-42.  Moreover, TiZA believed that indemnification of the Commissioner was required but nonetheless unilaterally deleted it in 2009, without any notice to the Commissioner.  *Id.* at 841-42.

[21]  The contract provisions also clearly do not release intentional, willful, and wanton acts, *see Myers*, 587 F.3d at 894, nor would the Commissioner seek indemnification for such acts.

The Commissioner's right to indemnification is clearly established as a matter of law.  Summary judgment on this claim is thus appropriate.

## CONCLUSION

The Commissioner took appropriate and prompt action in response to known complaints about TiZA.  She cannot be held constitutionally responsible for violations about which she did not know, including information that the TiZA Defendants actively withheld.  Plaintiff has failed to establish that there are any genuine disputes for trial on this issue and the Commissioner is thus entitled to judgment as a matter of law dismissing Plaintiff's Establishment Clause claim.

Consistent with applicable contracts and statute, the Commissioner also is entitled as a matter of law to indemnification.  Summary judgment on that claim is appropriate.

Dated:  _____          Respectfully submitted,

LORI SWANSON
Attorney General
State of Minnesota


s/ **Kathryn M. Woodruff**
Kathryn M. Woodruff
Assistant Attorney General
Atty. Reg. No. 0307440

445 Minnesota Street, #900
St. Paul, Minnesota 55101-2127
Telephone:  (651) 757-1361
Fax:  (651) 297-4139
kathryn.woodruff@state.mn.us

Attorneys for Minnesota Department of Education Commissioner Brenda Cassellius

AG: #2750712-v1